No. 24-1990

## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

RUTHIE WALLS, et al.,
Plaintiffs-Appellees,

v.

JACOB OLIVA, et al.
Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Arkansas
No. 4:24-CV-270 (Hon. Lee P. Rudofsky)

## Defendants-Appellants' Brief

TIM GRIFFIN
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

DYLAN L. JACOBS
  Deputy Solicitor General

ASHER STEINBERG
  Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@arkansasag.gov

**SUMMARY OF THE CASE AND STATEMENT
REGARDING ORAL ARGUMENT**

States and schools routinely make decisions about what and how they teach their students. This case concerns such a decision: a law barring public school teachers from compelling students to affirm a belief in Critical Race Theory, while leaving them free to teach about it and other divisive ideas. The district court enjoined that law—as applied to the non-compulsory teaching that it doesn't prohibit.

The district court made three critical errors, each of which independently requires reversal. First, in recognizing a First Amendment right to hear particular ideas from public schools, it applied *Pratt v. Independent School District No. 831*, 670 F.2d 771 (8th Cir. 1982), a 42-year-old circuit precedent that the Supreme Court's government-speech cases—and more specific pronouncements on the status of curricula—have overruled. . Second, it failed to decide whether Section 16 likely infringes on that supposed right, essentially holding only that Plaintiffs had standing to challenge Arkansas's law because it could reasonably be read to infringe on their right to receive information. Third, in reading the statute to ambiguously imply in one provision that the statute's prohibition reaches mere teaching about Critical Race Theory, the district court disregarded multiple provisions of the statute that expressly say otherwise. And it didn't offer a defensible reading of the one provision on which it relied. This Court should reverse.

Defendants request 15 minutes for argument.

# TABLE OF CONTENTS

Summary of the Case and Statement Regarding Oral Argument ............................ i

Table of Contents ............................................................................................ ii

Table of Authorities ........................................................................................ iv

Statement of Jurisdiction ................................................................................ viii

Statement of the Issues Presented .................................................................... ix

Statement of the Case .......................................................................................1

    A.  Section 16 of the LEARNS Act. ...........................................................1

    B.  The Plaintiffs' Claims. ........................................................................3

    C.  The District Court's Order. ..................................................................6

Standard of Review .........................................................................................13

Summary of the Argument ...............................................................................14

Argument ........................................................................................................16

I.  The First Amendment does not prohibit viewpoint-based selection of public schools' own curricular materials. ...................................16

    A.  Public school curricula are government speech, so the First Amendment does not regulate them. .....................................................17

    B.  The Supreme Court's government-speech cases, and statements on schools' curricular autonomy, have abrogated *Pratt*. .............................................................................................20

II.  The district court failed to decide whether Section 16 likely violated the right recognized in *Pratt*. .............................................26

III. Section 16 does not prohibit merely teaching about Critical Race Theory. ......................................................................................30

    A.  Section 16 only bans compelling students to affirm, adopt, or profess discriminatory ideologies, not discussing them. ...................31

    B.  The district court's contrary reading is unreasonable. ...........................33

Conclusion ......................................................................................................36

Certificate of Compliance ................................................................................38

Certificate of Service ...............................................................................39

# TABLE OF AUTHORITIES

**Cases**

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)..................................................................23

*Ark. Times LP v. Waldrip*,
37 F.4th 1386 (8th Cir. 2022) (en banc) .................................... 29, 36

*Axson-Flynn v. Johnson*,
356 F.3d 1277 (10th Cir. 2004) ..........................................19

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982)................................................................ 22-23

*Bennie v. Munn*,
822 F.3d 392 (8th Cir. 2016) ..............................................29

*Booker v. State*,
984 S.W.2d 16 (Ark. 1998)...................................................36

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005) ..................................... 19, 22

*City of Timber Lake v. Cheyenne River Sioux Tribe*,
10 F.3d 554 (8th Cir. 1993) ..............................................17

*C.K.-W. v. Wentzville R-IV Sch. Dist.*,
619 F. Supp. 3d 906 (E.D. Mo. 2022) .............................23

*Downes v. L.A. Unified Sch. Dist.*,
228 F.3d 1003 (9th Cir. 2000) ...........................................19

*Griswold v. Driscoll*,
616 F.3d 53 (1st Cir. 2010)..................................................19

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988)................................................... 9, 25-26

*Johanns v. Livestock Mktg. Ass'n*,
544 U.S. 550 (2005)...............................................................19

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)........................................................ 11, 27

*Nat'l Endowment for Arts v. Finley*,
524 U.S. 569 (1998).........................................................18

iv

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) .......................................................................30

*Pico v. Bd. of Educ.*,
638 F.2d 404 (2d Cir. 1980) .................................... 22-23

*Planned Parenthood of Ark. & E. Okla. v. Jegley*,
864 F.3d 953 (8th Cir. 2017) ....................................13

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
530 F.3d 724 (8th Cir. 2008) (en banc) ................. 13, 29

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009)..........................................17-18, 20-21

*Pratt v. Indep. Sch. Dist. No. 831*,
670 F.2d 771 (8th Cir. 1982) .................................. passim

*Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*,
413 F.3d 897 (8th Cir. 2005) ....................................24

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995).................................................23

*Rust v. Sullivan*,
500 U.S. 173 (1991).................................................21

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022).................................................18

*St. Louis Effort for AIDS v. Huff*,
782 F.3d 1016 (8th Cir. 2015) ..................................13

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014).................................................28

*Turtle Island Foods, SPC v. Thompson*,
992 F.3d 694 (8th Cir. 2021) ................... ix, 13, 15, 28

*United States v. Anderson*,
717 F.3d 1064 (8th Cir. 2014) ..................................21

*United States v. Steward*,
598 F.3d 960 (8th Cir. 2010) ....................................24

*United States v. Taylor*,
803 F.3d 931 (8th Cir. 2015) .............................. 21, 25

*United States v. Thomas*,
760 F.3d 879 (8th Cir. 2014) ...............................................21

*United States v. Villareal-Amarillas*,
562 F.3d 892 (8th Cir. 2009) ...............................................21

*United States v. Voelz*,
66 F.4th 1155 (8th Cir. 2023) ........................ ix, 14, 16, 24

*United States v. Williams*,
537 F.3d 969 (8th Cir. 2008) ...............................................24

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015)................................................ ix, 17-18, 20

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008)...............................................................13

*Wollschlaeger v. Governor, Fla.*,
848 F.3d 1293 (11th Cir. 2017) .........................................21

*Young v. United States*,
315 U.S. 257 (1942)...........................................................35

**Statutes**

28 U.S.C. 1292(a)(1) ............................................................. viii

28 U.S.C. 1331 ....................................................................... viii

2023 Ark. Acts 237, sec. 73(a) .................................................1

Ark. Code Ann. 6-16-156 ........................................................ ix

Ark. Code Ann. 6-16-156(a)(2) ...........................................2, 11

Ark. Code Ann. 6-16-156(a)(3) ...........................................2, 31

Ark. Code Ann. 6-16-156(b)................................................ 1, 32-33

Ark. Code Ann. 6-16-156(b)(1) ................................................1

Ark. Code Ann. 6-16-156(b)(2) ................................................2

Ark. Code Ann. 6-16-156(c)................................................2, 33

Ark. Code Ann. 6-16-156(c)(2) ........................................ 2, 15, 35

Ark. Code Ann. 6-16-156(d)............................................. passim

Ark. Code Ann. 6-16-156(e) ............................................ 2, 27, 31, 33

Ark. Code Ann. 6-16-156(f) .................................................................. 2-3

Ark. Code Ann. 6-16-1202(1)(B) ...............................................................5

Ark. Code Ann. 6-17-428(a)(3)(A)....................................................3, 31

Ark. Code Ann. 6-17-428(c)(B)........................................................3, 31

**Rules**

Ark. Admin. Code 005.28.17-6.0 ....................................................3, 31

**Other Authorities**

"*Prevent*," Cambridge English Dictionary,
    https://dictionary.cambridge.org/us/dictionary/english/prevent.................. 34-35

## STATEMENT OF JURISDICTION

The district court had original jurisdiction under 28 U.S.C. 1331. This Court has appellate jurisdiction over Defendants' appeal from its preliminary-injunction order under 28 U.S.C. 1292(a)(1). The district court entered its order granting Plaintiffs a preliminary injunction on May 7, 2024; this appeal was timely filed on May 10, 2024.

**STATEMENT OF THE ISSUES PRESENTED**

Whether the district court erred in preliminarily enjoining the enforcement of Section 16 of Arkansas Act 237 of 2023 on the grounds that it arguably prohibits non-compulsory instruction in Critical Race Theory and that students in public schools have a right under the First Amendment to receive information.

> <u>Apposite Authority</u>: *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015); *Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771 (8th Cir. 1982); *United States v. Voelz*, 66 F.4th 1155 (8th Cir. 2023); *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694 (8th Cir. 2021); Ark. Code Ann. 6-16-156.

## STATEMENT OF THE CASE

### A.     Section 16 of the LEARNS Act.

On March 14, 2023, Arkansas Governor Sarah Huckabee Sanders signed the LEARNS Act, an omnibus education reform bill, into law.  Under its emergency clause, 48 sections of the Act—including Section 16, the provision at issue here—became effective immediately.  *See* 2023 Ark. Acts 237, sec. 73(a).  In response to Arkansas's effort to hold struggling schools accountable and give parents more control of their children's education, a group of plaintiffs sought to delay those reforms by challenging the Act's emergency clause under state law.  The Arkansas Supreme Court rejected their challenge, upholding the emergency clause.  *See Ark. Dep't of Educ. v. Jackson*, 675 S.W.3d 416 (Ark. 2023).  Section 16 then went unchallenged until Plaintiffs below brought suit on March 25, 2024—over a year after it went into effect.

Section 16 directs the Secretary of the Arkansas Department of Education to take a variety of steps to prevent "prohibited indoctrination" in public schools, or "teaching that would indoctrinate students."  The statute defines "prohibited indoctrination" as compulsion to "adopt, affirm, or profess" certain discriminatory ideas, Ark. Code Ann. 6-16-156(b), including that members of one protected class "are inherently superior or inferior to people of another," *id.* 6-16-156(b)(1), or that individuals "should be discriminated against or receive adverse treatment" because

of their membership in a protected class, *id.* 6-16-156(b)(2). While the statute prohibits compelling students to espouse these ideas, it "does not prohibit the discussion" of those ideas, *id.* 6-16-156(c), or "related ideas that individuals may find unwelcome, disagreeable, or offensive," *id.* 6-16-156(c)(2). Thus, the statute "make[s] clear" that it doesn't reach "ordinary teaching." Add. 10; App. 224; R. Doc. 45, at 10. And while the statute identifies Critical Race Theory as an example of "ideologies . . . that conflict with the principle of equal protection under the law," Ark. Code Ann. 6-16-156(a)(2), it does not prohibit teaching about Critical Race Theory either. Instead, it only prohibits "teaching that would *indoctrinate* students with [those] ideologies," *id.* (emphasis added), a term defined in the statute to only include compulsion to adopt, affirm, or profess ideas.

Section 16 itself "contains no enforcement mechanism to punish individual teachers for engaging" in prohibited indoctrination. Add. 13; App. 227; R. Doc. 45, at 13. Instead, it directs the Secretary to take various steps to ensure that prohibited indoctrination will not occur in Arkansas public schools, *see* Ark. Code Ann. 6-16-156(a)(3), (d), (e), and authorizes the State Board of Education to promulgate implementing rules, *id.* 6-16-156(f). And other than Plaintiffs' disproven allegation that the Secretary withdrew AP status for a pilot African American Studies AP course under Section 16, Plaintiffs didn't point to any implementing rules or enforcement actions by the Secretary or Board below. However, given Section

16's prohibition, knowingly engaging in prohibited indoctrination would violate the Code of Ethics for Arkansas Educators, and could expose teachers to sanctions by the State Board of Education. *See id.*; Ark. Admin. Code 005.28.17-6.0 (requiring "professional and ethical behavior," inclusive of following state law); Ark. Code Ann. 6-17-428(a)(3)(A) (permitting sanctions for violations of the Code of Ethics if a teacher "knew or reasonably should have known that [an] act" was a violation). Those sanctions could range from a written reprimand to, in the most severe cases, the revocation or suspension of a teaching license. *Id.* 6-17-428(c)(B).

### B. The Plaintiffs' Claims.

Over a year after Section 16 went into effect, and shortly before the end of the first full school year in which Section 16 was in effect, Plaintiffs—two high school teachers, two high school students, and the Arkansas State Conference of the NAACP—brought suit to enjoin Section 16's enforcement under a number of constitutional theories. The teacher plaintiffs claimed its regulation of their conduct was void for vagueness, App. 53-55; R. Doc. 8, at 47-49, and that it violated their supposed First Amendment rights to teach viewpoints of their choosing, App. 57-59; R. Doc. 8, at 51-53. The student plaintiffs claimed it violated their supposed First Amendment right to be indoctrinated in—or, they say, to receive information about—Critical Race Theory and related ideas from their public school. App. 55-57; R. Doc. 8, at 49-51. And the minority-race teacher and student

plaintiffs claimed that Section 16's ban on compelling students to affirm discriminatory ideas was actually a covert attempt to ban teaching topics that disproportionately interest black students, in violation of the Equal Protection Clause. App. 60-64; R. Doc. 8, at 54-58.

Plaintiffs took over two weeks after filing suit to move for a preliminary injunction. In support of their motion, the two teacher plaintiffs and the president of the Arkansas State Conference of the NAACP filed declarations vaguely claiming that the teacher plaintiffs, and teacher members of the state NAACP, had self-censored their classroom instruction to comply with Section 16. As the district court found, those declarations entirely failed to explain why they thought Section 16 required that self-censorship.

For example, the state NAACP's president claimed that one NAACP member had stopped teaching *The Color Purple* or showing her students "online videos of Roland Martin . . . because of the LEARNS Act." App. 174 ¶ 12; R. Doc. 20, at 3 ¶ 12. But "[t]he Court [wa]s given no hint as to what specifically in *The Color Purple* and the Roland Martin videos this unnamed teacher believe[d] violates . . . Section 16." Add. 14; App. 228; R. Doc. 45, at 14. Plaintiff Ruthie Walls said she stopped teaching "certain aspects" of intersectionality, App. 148 ¶13; R. Doc. 16, at 3 ¶ 13; Michelle Alexander's *The New Jim Crow*, App. 148 ¶ 14; R. Doc. 16, at 3 ¶ 14; materials from The New York Times's "The 1619 Project," *id.*; and the

4

effect of desegregation on black teachers' employment, because she "fear[ed] that they may be seen as divisive . . . and therefore violate Section 16," App. 148 ¶ 15; R. Doc. 16, at 3 ¶ 15. Other than incorrectly suggesting that "divisive" materials violate Section 16, she did not explain what about any of those materials or topics would violate Section 16. Add. 15-16; App. 229-30; R. Doc. 45, at 15-16. And Plaintiff Colton Gilbert, a debate teacher, stopped teaching a chapter on Critical Race Theory, which he formerly used to help students "*explore and debate potential reasons* for past and present inequalities," not to "indoctrinat[e] students." App. 156 ¶¶ 12, 13; R. Doc. 17, at 3 ¶¶ 12, 13. Nevertheless, he claimed he believed continuing to teach about Critical Race Theory would violate Section 16.

In addition to the teacher plaintiffs' purporting to self-censor their instruction to comply with Section 16, Plaintiffs claimed below that the Secretary of Education revoked an AP African American Studies pilot course's AP designation in response to Section 16's enactment. Add. 11; App. 225; R. Doc. 45, at 11. The district court didn't make a finding on that claim because it correctly deemed it immaterial to Plaintiffs' claims, Add. 11 n.43; App. 225 n.43; R. Doc. 45, at 11 n.43, but Defendants disproved Plaintiffs' claim below. They explained that under Arkansas law, a course must be "approved by the College Board" to qualify as an AP course. Ark. Code Ann. 6-16-1202(1)(B). The African American Studies course, which was a pilot course, didn't yet have that approval—hence its pilot status.

App. 180 ¶¶ 15-16; R. Doc. 36-1, at 4 ¶¶ 15-16 (declaration of the Secretary). After "an AP course code was issued as an oversight" for the 2022-23 year, App. 180 ¶ 16; R. Doc. 36-1, at 4 ¶ 16, the state course code was withdrawn for the following year once "the oversight was identified," App. 181 ¶ 18; R. Doc. 36-1, at 4 ¶ 18. Nevertheless, the Department of Education allowed schools to choose to participate in the pilot to teach the course, give students in it an AP examination, and award weighted GPA credit. App. 181 ¶¶ 19-20; R. Doc. 36-1, at 5 ¶¶ 19-20. And once the course received College Board approval in the spring of 2024, the Department of Education officially recognized it as an AP course. App. 182 ¶¶ 23-25; R. Doc. 36-1, at 6 ¶¶ 23-25.

### C.  The District Court's Order.

Plaintiffs sought a preliminary injunction on only the teacher plaintiffs' vagueness claim and the student plaintiffs' right-to-receive-information claim. Add. 1; App. 215; R. Doc. 45, at 1. At the preliminary-injunction hearing, Plaintiffs offered no testimony, relying solely on their declarations. Defendants, who enforce Section 16, explained both in their briefing and at the hearing that Section 16 did not require teacher plaintiffs' self-censorship. Specifically, they explained that nothing in "Section 16 prohibits a teacher from teaching about Critical Race Theory," or "any other theory or ideology"; rather, Section 16 only prohibits

"compelling students" to adopt, affirm, or profess discriminatory ideas.  Add. 38; App. 252; R. Doc. 45, at 38.

A week after the hearing, the district court denied Plaintiffs' motion for a preliminary injunction on their vagueness claim, Add. 25-33, App. 239-47; R. Doc. 45, at 25-33, and granted them a narrow injunction on their right-to-receive-information claim, Add. 47-49; App. 261-63; R. Doc. 45, at 47-49.  That injunction solely barred Defendants from preventing the two teacher plaintiffs from teaching about Critical Race Theory—the very thing Defendants said the statute did not prohibit—but allowed Defendants to discipline the teacher plaintiffs for compelling students to adopt, affirm, or profess Critical Race Theory.  *Id.*

The district court denied the teacher plaintiffs an injunction on their vagueness claim because it found they failed to show irreparable harm.  Add. 25; App. 239; R. Doc. 45, at 25.  Critically, in reaching that conclusion, the district court held that in self-censoring their curricular speech in response to Section 16, the teacher plaintiffs were "not censoring their own speech as individuals, but rather . . . government speech," Add. 27; App. 241; R. Doc. 45, at 27, a proposition the district court said "clearly and ineluctably follows from Supreme Court precedent," Add. 26-27; App. 240-41; R. Doc. 45, at 26-27.  That rendered inapplicable the rule that where First Amendment rights are chilled, irreparable harm automatically attaches.  Add. 27; App. 241; R. Doc. 45, at 27.  And absent that shortcut to

irreparable harm, the teacher plaintiffs couldn't show irreparable harm "by any other means," Add. 29; App. 243; R. Doc. 45, at 29, since "no evidence in th[e] record . . . suggest[ed] any of the Teacher Plaintiffs face[d] an imminent threat of discipline," Add. 28-29; App. 242-43; R. Doc. 45, at 28-29. Moreover, Plaintiffs' "thirteen-month delay" in filing suit belied their claim that they were facing irreparable harm. Add. 33; App. 247; R. Doc. 45, at 33.

The district court then turned to the student plaintiffs' right-to-receive-information claim. As an initial matter, the district court said that, "were it writing on a clean slate," it would hold students did not have a First Amendment right to receive any particular information from public schools. Add. 34; App. 248; R. Doc. 45, at 34. That's because public school curricula are "quintessential government speech," *id.*—as the district court already held in denying an injunction on Plaintiffs' vagueness claim—and "government speech is not regulated by the Free Speech Clause of the First Amendment," *id.* But it held it was bound to recognize a First Amendment right to control schools' government speech by this Court's 42-year-old decision in *Pratt v. Independent School District No. 831*, 670 F.2d 771 (8th Cir. 1982).

In that case, this Court held that the First Amendment prohibited a school district from removing a film adaptation of Shirley Jackson's *The Lottery* from its own curriculum because it disagreed with the ideas the film expressed—holding,

8

that schools could not discriminate on the basis of viewpoint even in selecting their own speech. Defendants argued that *Pratt* had been abrogated by the Supreme Court's subsequent cases announcing the government-speech doctrine, which didn't exist when *Pratt* was decided. The district court agreed that *Pratt* was "something akin to zombie precedent," Add. 36; App. 250; R. Doc. 45, at 36, and that the government-speech doctrine, and curricula's status as government speech, could not "possibly lead" to the result in *Pratt*, *id.* Yet it held that *Pratt* was still binding. Claiming without any citation that decisions of this Court still bind district courts so long as there is "some doubt" about whether Supreme Court decisions have abrogated them, *id.*, it said "some doubt" existed because no Supreme Court decision "specific[ally] repudiat[ed]" *Pratt*'s outlier holding, Add. 35; App. 249; R. Doc. 45, at 35, and Supreme Court decisions after *Pratt* had recognized limited First Amendment protections for *students*' curricular speech, Add. 36; App. 250; R. Doc. 45, at 36 (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270-273 (1988)).

Proceeding on the premise that *Pratt* was still good law, the district court said that even if that were the case, Defendants would still "win hands down" so long as their reading of Section 16 as banning only compulsion was correct. Add. 39; App. 253; R. Doc. 45, at 39. That's because *Pratt* only held there was a right to receive certain ideas, not a right to be compelled to agree with them. Add. 37;

App. 251; R. Doc. 45, at 37.  And the district court further said that "a quick read of Section 16 supports" Defendants' reading.  Add. 39; App. 253; R. Doc. 45, at 39.  Section 16's definition of "prohibited indoctrination" only reached compulsion; "[n]othing in that definitional section" suggested that "the mere teaching of Critical Race Theory (or any other theory, ideology, or idea) amounts to a violation of Section 16."  Add. 41; App. 255; R. Doc. 45, at 41.  And Section 16(c)'s savings clause, the district court agreed, "makes clear that it's the compulsion of a student to accept (and not the mere teaching of) the concepts identified in Section 16(b) that is prohibited."  *Id.*

Yet the district court declined to adopt that plain-language reading of Section 16.  Instead, citing its duty to "read[] the statute as a whole" and not "isolate words out of context," *id.*, it said that an isolated four words in subsection (d) made Plaintiffs' claim that Section 16 prohibited teaching about Critical Race Theory "plausible," "reasonable," and "not a frivolous concern."  Add. 42; App. 256; R. Doc. 45, at 42.  Those four words direct the Secretary to—within his own department—"review and enhance the policies that prevent prohibited indoctrination, *including Critical Race Theory*."  *Id.* (quoting Ark. Code Ann. 6-16-156(d)) (emphasis added).  The district court claimed that language "suggests that Critical Race Theory is, definitionally, 'prohibited indoctrination.'"  *Id.*  And if Critical Race Theory were by definition "prohibited indoctrination," it arguably followed that

teachers could not teach about it.  *Id.*  Without deciding whether that reading of the statute was correct, or even likely correct, the district court said its reasonableness made the teachers' self-censorship of instruction about Critical Race Theory "'fairly traceable' to Section 16," citing standing law.  Add. 43; App. 257; R. Doc. 45, at 43 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

The district court then proceeded to deciding whether the State could justify banning teaching about Critical Race Theory, without deciding whether the State had.  *Id.*  On that score, it said the Defendants "have not even tried to assert a legitimate pedagogical interest" in prohibiting teaching about Critical Race Theory, since they maintained that Section 16 didn't do so.[1]  *Id.*  That meant, the court said, that the student plaintiffs were "more likely than not to prevail under *Pratt*"—though the district court never held that Section 16 likely prohibited teaching about any topic in the first place.  Add. 44; App. 258; R. Doc. 45, at 44.

On the balance of harms, it said that "irreparable harm flow[ed] automatically" from the First Amendment violation it found Plaintiffs likely suffered, *id.*, and that "there is no concrete harm" to Defendants from enjoining Section 16 as applied to teaching about Critical Race Theory because "the only thing being

_____

[1] If Section 16 prohibited merely teaching about Critical Race Theory, Arkansas would have a legitimate pedagogical interest in prohibiting it.  States indisputably have a legitimate interest in declining to teach ideologies that—as Section 16 itself says—"conflict with the principle of equal protection" by urging openly race-based policies.  Ark. Code Ann. 6-16-156(a)(2).

enjoined is something the Defendants believe the statute does not do anyway," Add. 45; App. 259; R. Doc. 45, at 45.

Finally, the district court limited its injunction to the two teacher plaintiffs because Defendants had "made crystal clear" that they would not enforce Section 16 to ban teaching about Critical Race Theory, making it unnecessary to apply the injunction more broadly. Add. 46; App. 260; R. Doc. 45, at 46. The district court did not explain why, by the same logic, it wasn't unnecessary to grant an injunction at all.

In sum, then, the district court enjoined Defendants from enforcing Section 16 so as to discipline the two student teachers for teaching about or referring to Critical Race Theory, while permitting Defendants to discipline the teacher plaintiffs for compelling students to profess a belief in Critical Race Theory, or any other ideas that Section 16 prohibits indoctrinating in students. Add. 47-48; App. 261-62; R. Doc. 45, at 47-48.

Defendants timely appealed the district court's order on May 10, 2024, App. 265, R. Doc. 48, and asked the district court to stay proceedings below pending this appeal on the same date. The district court denied Defendants' motion to stay proceedings below in a docket entry. R. Doc. 52.

## STANDARD OF REVIEW

This Court generally reviews preliminary injunctions for abuse of discretion, but "[w]hen purely legal questions are presented," as here, "this [C]ourt owes no special deference to the district court" and reviews its legal determinations de novo. *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1021 (8th Cir. 2015).

The underlying preliminary-injunction standard requires Plaintiffs to make a "clear showing" that each preliminary-injunction factor favors them. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). And on the likelihood-of-success factor, Plaintiffs were required to make a "more rigorous showing" than usual "that [they were] likely to prevail on the merits" in order to obtain an injunction blocking enforcement "of a duly enacted state statute." *Planned Parenthood of Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 957-58 (8th Cir. 2017) (citing *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (en banc)). That showing includes demonstrating that they were likely to succeed on the state-law question of whether Section 16 prohibited the speech they claim the First Amendment protects. *See Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 700-01 (8th Cir. 2021).

## SUMMARY OF THE ARGUMENT

The district court made three critical errors.  Each error independently requires reversal, but this Court should take the opportunity presented by this case to make clear that *Pratt v. Independent School District No. 831* has been overruled.

First, the district court wrongly relied on *Pratt*.  The district court agreed that public school curricula are government speech, and that the First Amendment does not regulate government speech.  Yet it held that this Court's opinion in *Pratt*—a decision predating the Supreme Court's first government-speech cases by a decade—still prohibits viewpoint-based selection of public school curricula in this Circuit.  That conclusion was based on a misapprehension of the test for when Supreme Court decisions abrogate decisions of this Court.  The district court said that this Court's decisions still control so long as there is "some doubt" about their continuing vitality, but this Court has repeatedly held its decisions are no longer binding if they are "cast into doubt" by Supreme Court precedent.  *United States v. Voelz*, 66 F.4th 1155, 1162 (8th Cir. 2023).  The Supreme Court's government-speech cases do much more than that for *Pratt*.  Indeed, even "some doubt" is too generous a description of *Pratt*'s status.  As the district court acknowledged, it is impossible to reconcile the government-speech doctrine with *Pratt*.

Second, having incorrectly held that *Pratt* was still the law, the district court failed to decide whether its rule was likely violated.  Instead, it held only that a

reading of Section 16 that would potentially violate *Pratt*—namely, that Section 16 prohibited merely teaching about Critical Race Theory, not just compelling adherence to it—was "reasonable" and non-frivolous, which meant Plaintiffs' voluntary self-censorship was fairly traceable to Section 16. That reasoning would have sufficed for a standing analysis, but it does not suffice for the merits. Instead, this Court has made clear that to hold plaintiffs are likely to succeed on a First Amendment claim on the merits, a court must find that a statute *likely* prohibits protected speech—not just that it *arguably* does. *See Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 700-01 (8th Cir. 2021). The district court's failure to make that determination alone requires reversal.

Third and finally, the district court's "reasonable" reading of Section 16 is not even a possible reading of Section 16, much less likely correct. Nothing in Section 16's definition of "prohibited indoctrination" suggests that non-compulsory teaching about Critical Race Theory is prohibited. What's more, the following subsection of the statute expressly disclaims banning the discussion of any ideas, no matter how "offensive." Ark. Code Ann. 6-16-156(c)(2). The statute's directive to the Secretary to "prevent prohibited indoctrination, including Critical Race Theory," *id.* 6-16-156(d), does not suggest otherwise. That provision simply implies, consistent with the definition of "prohibited indoctrination," that "prohibited indoctrination" includes *indoctrination* in Critical Race Theory. The contrary

reading—that the Secretary must "prevent" Critical Race Theory itself—is nonsensical, because ideas cannot be "prevented"; only actions, like indoctrination, can.

## ARGUMENT

### I. The First Amendment does not prohibit viewpoint-based selection of public schools' own curricular materials.

The district court held that public school students have a First Amendment right to compel public schools to teach them about Critical Race Theory, or any other subject that in a federal court's view schools lack a "legitimate pedagogical interest" for declining to teach. Add. 35, 43; App. 249, 257; R. Doc. 45, at 35, 43. The district court agreed with Defendants that public school teachers' instructional speech is "clearly" government speech. Add. 26; App. 240; R. Doc. 45, at 26. And it agreed that fact cannot "possibly" be squared with a rule that subjects States and localities' "selection . . . of curricula to Free Speech Clause scrutiny." Add. 36; App. 250; R. Doc. 45, at 36. But deeming itself bound by *Pratt*, a decision it called a "zombie precedent" that predates the modern government-speech doctrine by decades, *id.*, the district court did just that. It claimed that, absent the Supreme Court's specifically overruling *Pratt*'s rule, it had to follow *Pratt*, even though it admitted it was impossible to square *Pratt* with current Supreme Court doctrine.

That was error. This Court has held dozens of times that its decisions are no longer binding when they are "cast into doubt" by a Supreme Court decision. *See United States v. Voelz*, 66 F.4th 1155, 1162 (8th Cir. 2023) (the latest decision to

16

state this rule); *City of Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554, 557 (8th Cir. 1993) (the earliest). And, as explained below, this Court has held that rule applies to district courts, not just subsequent panels. Under that rule, *Pratt* has easily been overruled. *Pratt* hasn't just been cast into doubt by subsequent Supreme Court decisions; it's irreconcilable with them. If, as the Supreme Court held after *Pratt*, the First Amendment does not regulate government speech, there can be no First Amendment right to compel the government to teach—and thus to speak about—any topic. But even if the district court wasn't permitted to decide whether *Pratt* has been overruled, this Court certainly can. It should hold that *Pratt* is no longer good law and reverse the district court.

A. Public school curricula are government speech, so the First Amendment does not regulate them.

Plaintiffs claim that Arkansas's regulation of its own public schools' curricula violates the First Amendment. But if those curricula are government speech, that cannot be. The Free Speech Clause only "restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). "Thus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). And rules that would be invalid content- or viewpoint-based restrictions if applied to

17

private speech are entirely permissible self-regulations of government speech. For "[i]t is the very business of government to favor and disfavor points of view" when it is speaking. *Summum*, 555 U.S. at 468 (quoting *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in the judgment)).

Public school curricula and teachers' instructional speech are "pure government speech," as the district court held. Add. 36; App. 250; R. Doc. 45, at 36. Speech is government speech if the government "maintains direct control over the messages [it] convey[s]," *Walker*, 576 U.S. at 213, the speech is used to "communicate[] messages from" the government, *id.* at 211, and the speech is "closely identified" with the government "in the public mind," *id.* at 212 (quoting *Summum*, 555 U.S. at 472). *See also Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022) (deeming relevant "the history of the expression at issue; the public's likely perception as to who . . . is speaking; and the extent to which the government has actively shaped or controlled the expression"). Under that rubric, the Supreme Court has held that even a state's offering of "more than 350 varieties" of specialty license plates displayed on private citizens' vehicles is government speech. *Walker*, 576 U.S. at 221 (Alito, J., dissenting).

As the district court held, under that standard, "it is clear that [curricular] speech is government speech." Add. 36 n.196; App. 250 n.196; R. Doc. 45, at 36 n.196. The materials contained in public school curricula are "from beginning to

end" selected by the government, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560 (2005); by definition, nothing becomes part of a public-school curriculum unless a government actor puts it there. Public school curricula are used to communicate educational messages to students from the government; that's their whole point. And the public is more than "likely to believe that the government is speaking when it selects and implements curricula." Add. 36 n.196; App. 250 n.196; R. Doc. 45, at 36 n.196.

Accordingly, this Court's sister circuits that have addressed the issue since the government-speech doctrine was developed have widely concluded that curricular speech is government speech. *See Griswold v. Driscoll*, 616 F.3d 53, 58-59 (1st Cir. 2010) (Souter, J.) (holding states have plenary "curricular discretion" under the First Amendment given "the government's authority to choose viewpoints when the government itself is speaking"); *Chiras v. Miller*, 432 F.3d 606, 616 (5th Cir. 2005) ("[S]chools engage in government speech when they set and implement education policy through the curriculum."); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1289 (10th Cir. 2004) ("Few activities bear a school's 'imprimatur' . . . more significantly than speech that occurs within a classroom setting as part of a school's curriculum."); *Downes v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1015-16 (9th Cir. 2000) ("[S]chool teachers have no First Amendment right to influence curriculum as they so choose.") (collecting cases). That means that the First

Amendment does not restrict States' and public schools' curricular choices. Indeed, if those choices were subject to the rules against content- and viewpoint-based regulation that apply to private speech, it would be impossible to design a curriculum at all. *See Walker*, 576 U.S. at 208 ("'[I]t is not easy to imagine how government could function if it lacked th[e] freedom' to select the messages it wishes to convey." (quoting *Summum*, 555 U.S. at 468)).

B.    The Supreme Court's government-speech cases, and statements on schools' curricular autonomy, have abrogated *Pratt*.

The district court agreed with all this. Add. 34; App. 248; R. Doc. 45, at 34 ("The Court is convinced that, were it writing on a clean slate, the Defendants' legal position would carry the day."). But it said it was bound to subject the State's curricular choices to First Amendment scrutiny under this Court's 42-year-old decision in *Pratt*. There, this Court set aside a school district's choice to stop showing students a film adaptation of Shirley Jackson's short story *The Lottery*. Treating the district's decision as though it had censored *private* screenings of the film, *see Pratt*, 670 F.2d at 779 (describing its decision as a "[r]estraint on protected speech"), the panel held that once it became a part of the district's curriculum, it could not be removed, under the First Amendment, because of its "ideological content," or a "wish to prevent the ideas contained in the material from being expressed in the school," *id.* at 773.

That decision is no longer good law and does not bind this Court. "[A] prior panel ruling does not control 'when the earlier panel decision is cast into doubt by an intervening Supreme Court decision,'" *United States v. Taylor*, 803 F.3d 931, 933 (8th Cir. 2015) (quoting *United States v. Anderson*, 717 F.3d 1064, 1067 (8th Cir. 2014)), or if "a supervening Supreme Court decision undermines" the earlier decision, *United States v. Thomas*, 760 F.3d 879, 890 (8th Cir. 2014) (quoting *United States v. Villareal-Amarillas*, 562 F.3d 892, 898 n.4 (8th Cir. 2009)). Subsequent Supreme Court decisions do more than that here. As the district court acknowledged, *Pratt* is impossible to square with the government-speech doctrine. Add. 36; App. 250; R. Doc. 45, at 36 (agreeing the government-speech doctrine cannot "possibly lead" to the result in *Pratt*). And that doctrine did not exist when *Pratt* was decided—which is why *Pratt* treated the film in that case as though it were private speech. The Supreme Court didn't apply that doctrine until 1991, *see Rust v. Sullivan*, 500 U.S. 173 (1991), a decade after *Pratt*, and the Supreme Court was still describing it as "recently minted" in 2009, *Summum*, 555 U.S. at 481 (Stevens, J., concurring).

Therefore, as other courts of appeals have held about similar decisions predating the government-speech doctrine, *Pratt* is no longer good law. *See Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1311 n.6 (11th Cir. 2017) (holding a 1980 circuit precedent according public school teachers First Amendment rights in

their official speech likely only "remains good law for those . . . who are *not* public employees"); *Chiras*, 432 F.3d at 617 (explaining a circuit precedent applying a similar rule to *Pratt* "was decided before *Rust* . . . and therefore did not have the benefit of the Supreme Court's clarification of the government's authority over its own message"). *Pratt* did not ask whether curricular selection was government speech because the concept did not exist yet. Instead, it simply applied ordinary rules against viewpoint discrimination as if they applied without change to a government's own selection of message. Plaintiffs might dispute whether curricular selection is government speech, but at minimum, the Court's government speech cases undermine *Pratt*'s reasoning and cast doubt on whether it is correct.

In addition to the intervening development of government-speech doctrine, in the decades since *Pratt* the Supreme Court has specifically spoken to school curricula and said that the First Amendment does not constrain the government's selection of their contents. *Pratt* relied extensively on the Second Circuit's decision in *Pico v. Board of Education*, 638 F.2d 404 (2d Cir. 1980), which held that schools could not remove books from public school libraries on ideological grounds. But when the Supreme Court affirmed the Second Circuit, it went out of its way to disclaim any effects of its holding on curricula, indicating that in that realm schools had absolute discretion. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 869 (1982) (plurality) (distinguishing

"absolute discretion in matters of *curriculum*" and "the compulsory environment of the classroom" from "the school library and the regime of voluntary inquiry that there holds sway"); *id.* at 878 n.1 (Blackmun, J., concurring in part and concurring in the judgment) ("[I]t is difficult to see the First Amendment right that I believe is at work here playing a role in a school's choice of curriculum.").  As another district court in this Circuit has explained, "the Justices voting in the majority in *Pico* rejected the idea central to *Pratt*, that a federal court could review and countermand the curriculum decisions of local school authorities."  *C.K.-W. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 914 n.4 (E.D. Mo. 2022).

And a decade after *Pico*, the Court again distinguished curricular speech from other kinds of speech in school, explaining that "[w]hen the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995); *see also Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) ("Much like a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum, a broadcaster by its nature will facilitate the expression of some viewpoints instead of others.").

In spite of all this the district court held it, if not this Court,[2] was still bound by *Pratt*.  Its reasons for that conclusion do not hold water.  Overlooking this Court's own precedent on the precedential value of its decisions, the district court claimed, without any citation, that so long as there was "some doubt" about whether *Pratt* was still correct it must follow *Pratt*.  Add. 36; App. 250; R. Doc. 45, at 36.  Yet the rule is the opposite.  A decision of this Court, this Court has repeatedly held, is no longer binding when subsequent Supreme Court decisions "cast [it] into doubt," *Voelz*, 66 F.4th at 1162—which by definition leaves room for doubt on the other side.  And to the extent the district court merely suggested this standard cannot be applied by district courts, that too is not correct.  *See United States v. Steward*, 598 F.3d 960, 962 (8th Cir. 2010) (holding that even this Court's mandates need not be followed on remand "when the earlier panel decision is cast into doubt by a decision of the Supreme Court") (quoting *United States v. Williams*, 537 F.3d 969, 975 (8th Cir. 2008)); *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897, 904 (8th Cir. 2005) (holding district court could modify an injunction this Court had ordered it to enter because the Supreme Court had indirectly abrogated this Court's decision).  In any event, whatever the district court's authority to declare a precedent of this Court overruled by the Supreme

---

[2] *See* Add. 37; App. 251; R. Doc. 45, at 37 (acknowledging "an Eighth Circuit panel [may] ha[ve] greater authority" to hold *Pratt* overruled).

Court, a panel of this Court certainly may. *See, e.g.*, *Taylor*, 803 F.3d at 933 (holding a "prior panel ruling does not control when the earlier panel decision is cast into doubt by an intervening Supreme Court decision") (internal quotation marks omitted).

Though "some doubt" isn't the standard, the district court was also mistaken in holding that there is even some doubt about whether *Pratt* is still the law. The district court gave two reasons for that conclusion. First it said there has been no "specific repudiation" of *Pratt*'s rule—apart from the statements in *Pico*, *Rosenberger*, and *Forbes* that do specifically repudiate any First Amendment right to control the government's classroom speech, which the district court seems to have deemed dicta. Add. 35; App. 249; R. Doc. 45, at 35. But specific repudiation isn't required. What would matter, if "some doubt" were the test, is that *Pratt* cannot "possibly" be reconciled with the government-speech doctrine. Add. 36; App. 250; R. Doc. 45, at 36. Second, and potentially more relevantly, the district court claimed that "there are Supreme Court cases that seem to at least suggest the continued vitality" of the rule in *Pratt*. *Id.* But the only case the district court cited was *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), which, besides predating the government-speech doctrine, involved *student* speech in curricular activities, not curricular government speech. Curricular student speech receives less protection than other kinds of student speech, as *Hazelwood* held. But it isn't

government speech, nor did *Hazelwood* say it was. So *Hazelwood* doesn't suggest that *Pratt* might still be correct.

In sum, *Pratt* is irreconcilable with the Supreme Court's government-speech cases that came after it; it wrongly applies First Amendment doctrines to the government's curation of its own speech. This Court should hold that *Pratt* has been overruled and reverse the district court.

## II. The district court failed to decide whether Section 16 likely violated the right recognized in *Pratt*.

The district court held it was "reasonable," "plausible," and "not . . . frivolous" to read Section 16 to prohibit mere "teaching about Critical Race Theory," and therefore enjoined Defendants from enforcing Section 16 in that fashion. Add. 42; App. 256; R. Doc. 45, at 42. But whether it is merely "reasonable" to read Section 16 that way was not the right question. In order for the district court to hold Plaintiffs' right-to-receive-information claim was likely to succeed, it had to hold Plaintiffs' claim that Section 16 infringed on that supposed right was likely correct—not just that it was reasonable. In suggesting otherwise, the district court conflated the standard for standing with the standard for likelihood of success on the merits. That error alone mandates reversal.

The district court did not hold that Section 16 prohibits teaching about Critical Race Theory. Indeed, it acknowledged that "[n]othing" in Section 16's definition of "prohibited indoctrination" "suggests the mere teaching of Critical Race

Theory" is prohibited, Add. 41; App. 255; R. Doc. 45, at 41; that Section 16's savings clause "makes clear that it is the compulsion of a student to accept (and not the mere teaching of)" concepts like Critical Race Theory "that is prohibited," *id.*, and that the statute's reference to "prohibited indoctrination *or* Critical Race Theory," Ark. Code Ann. 6-16-156(e) (emphasis added), "suggests the exact opposite" of Plaintiffs' reading, Add. 42 n.222; App. 256 n.222; R. Doc. 45, at 42 n.222.

Rather than hold that Section 16 prohibited or even likely prohibited teaching about Critical Race Theory, the district court held only that a single provision's reference to "policies that prevent prohibited indoctrination, including Critical Race Theory," Ark. Code Ann. 6-16-156(d), made it "plausible to suggest" that teaching about Critical Race Theory was "prohibited indoctrination." Add. 42; App. 256; R. Doc. 45, at 42. Having decided that the Plaintiffs' fear of being sanctioned for teaching about Critical Race Theory was "not a frivolous concern," *id.*, the district court concluded that the Plaintiffs' choice to self-censor and "withhold[] . . . information from students" about Critical Race Theory was "'fairly traceable' to Section 16," citing standing law. Add. 43; App. 257; R. Doc. 45, at 43 (quoting *Lujan*, 504 U.S. at 560). It then proceeded to decide whether Arkansas "ha[d] a legitimate pedagogical interest" in not teaching about Critical Race Theory, *id.*—without deciding if Section 16 likely prohibited teaching it.

The district court's inquiry into whether Section 16 could merely be reasonably read to prohibit teaching about Critical Race Theory would have been appropriate had it been addressing standing.  To show standing in a First Amendment case, a plaintiff need only show that her speech is "arguably proscribed" by the law she seeks to challenge, not that it actually is.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014).  Otherwise, courts would have to decide much of the merits of First Amendment claims simply to decide jurisdiction.  But as this Court has held—in language that perfectly describes the district court's error here—applying First Amendment standing's "arguably proscribed" standard to the merits "conflates the legal standard properly applied during standing analysis with that properly applied to the merits of a First Amendment claim."  *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 700 (8th Cir. 2021).  Indeed, the "arguably proscribed" standard "does no work for [p]laintiffs beyond the standing context."  *Id.*

Instead, to obtain a preliminary injunction against enforcing a state law, First Amendment plaintiffs must show their protected speech is "likely to be seen" as prohibited by the officials charged with enforcing state law.  *Id.* at 701.  After all, it doesn't violate the First Amendment to enact a law that is reasonably misread to prohibit protected speech; it only violates the First Amendment to actually prohibit protected speech.  So for First Amendment plaintiffs to "meet the 'more rigorous standard' of showing they are 'likely to prevail on the merits' of their claim" that

applies to "a challenge to a validly enacted state statute," *id.* at 701 (quoting

*Rounds*, 530 F.3d at 732), they must show their protected speech is likely prohib-

ited by state law, not just arguably so.  That is why in First Amendment cases, this

Court deems it its "responsibility to predict, as best [it] can," how state courts

would interpret a state law, rather than asking whether the plaintiff's reading of the

state law is arguably correct.  *Ark. Times LP v. Waldrip*, 37 F.4th 1386, 1392 (8th

Cir. 2022) (en banc).

The district court didn't do that analysis here; nor did it hold that teaching

about Critical Race Theory was likely prohibited by Section 16.  Instead, it granted

Plaintiffs' motion for a preliminary injunction after only finding enough to con-

clude Plaintiffs had standing to challenge Section 16.  Indeed, far from finding a

likely First Amendment violation, the district court's reasoning suggests that it

didn't believe there was one.  The district court acknowledged, for instance, that it

was enjoining a reading of Section 16 that Defendants had "repeatedly and clearly

disclaimed," Add. 44-45; App. 258-59; R. Doc. 45, at 44-45; that was at best non-

frivolous and arguable; and that it recognized Section 16's savings clause "makes

clear" is incorrect, Add. 41; App. 255; R. Doc. 45, at 41.

Thus, the district court's injunction did "little or nothing more than order the

defendants to obey [their own] law."  *Bennie v. Munn*, 822 F.3d 392, 397 (8th Cir.

2016).  In its own words, "the only thing being enjoined is something the

Defendants believe the statute does not do anyway." Add. 45; App. 259; R. Doc. 45, at 45; *but see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) (holding federal courts cannot enjoin state officials to follow state law). That might have been permissible if the district court had held "the thing being enjoined" was something the statute likely *did* do. But it isn't permissible where the district court only held that the thing being enjoined was something the statute *could* be reasonably read to do. At minimum, then, this Court must reverse and remand for the district court to decide whether Section 16 likely does infringe on the supposed right to receive information.

## III.   Section 16 does not prohibit merely teaching about Critical Race Theory.

The district court failed to decide if Section 16 likely prohibited teaching about Critical Race Theory, holding only that it could be reasonably read to do so. But even if that were the right question—or even if the district court's statements on the mere plausibility of Plaintiffs' interpretation could be read as implicitly holding that Plaintiffs' interpretation was likely correct—Plaintiffs' interpretation isn't reasonable. Instead, as even the district court acknowledged, it is expressly disclaimed by the plain text of the statute. *See* Add. 41; App. 255; R. Doc. 45, at 41 (agreeing that Section 16's savings clause "makes clear that it is the compulsion of a student to accept (and not the mere teaching of) the concepts identified in Section 16(b) that is prohibited").

A. <u>Section 16 only bans compelling students to affirm, adopt, or profess discriminatory ideologies, not discussing them.</u>

Section 16 requires the Secretary of the Department of Education to take a variety of steps to "prevent prohibited indoctrination," a defined term, in Arkansas public schools or in the work of the Department. Ark. Code Ann. 6-16-156(d); *see id.* 6-16-156(a)(3) (requiring the Secretary to amend Department policies and materials that contain prohibited indoctrination); *id.* 6-16-156(e) (requiring the Secretary to ensure that public school students are not required to attend trainings or orientations based on prohibited indoctrination). Section 16 itself does not directly prohibit teachers from engaging in "prohibited indoctrination." *See* Add. 13; App. 227; R. Doc. 45, at 13 ("Section 16 contains no enforcement mechanism to punish individual teachers for engaging in . . . conduct Section 16 prohibits."). But, given Section 16, knowingly engaging in prohibited indoctrination would constitute a violation of the Code of Ethics for Arkansas Educators that could expose teachers to sanctions by the State Board of Education. *See id.*; Ark. Admin. Code 005.28.17-6.0 (requiring "professional and ethical behavior," inclusive of following state law); Ark. Code Ann. 6-17-428(a)(3)(A) (permitting sanctions for violations of the Code of Ethics if a teacher "knew or reasonably should have known that [an] act" was a violation); *id.* 6-17-428(c)(B) (authorizing sanctions ranging from a written reprimand to, in the most severe cases, the revocation or suspension of a teaching license).

The question then becomes what prohibited indoctrination is. Section 16 gives a clear answer, precisely defining the term. "As used in [Section 16], 'prohibited indoctrination' means communication" by public school employees, including teachers, that "compels a person to adopt, affirm, or profess an idea" contrary to Titles IV and VI of the Civil Rights Act of 1964, including that people of one protected class "are inherently superior or inferior to people of another," or that individuals "should be discriminated against" on the basis of their membership in a protected class. Ark. Code Ann. 6-16-156(b). Merely discussing those ideas, under that definition, is not prohibited indoctrination; only "compel[ling] a person to adopt, affirm, or profess" them is. *Id.* As the district court readily found, those words have "everyday, ordinary meaning[s]," Add. 40; App. 254; R. Doc. 45, at 40, and putting them together, Section 16 "prohibit[s] teachers from forcefully or irresistibly urging a student to express a strong belief in, to confess allegiance to, or to begin practicing an ideology that is in violation" of Titles IV and VI and equal protection, Add. 41; App. 255; R. Doc. 45, at 41.

That definition would alone suffice to rule out reading "prohibited indoctrination" to include ordinary, non-compulsory teaching about Critical Race Theory. But for avoidance of doubt, Section 16 expressly disclaims that sort of misreading. Subsection (c) of the statute provides that the statute "does not prohibit the discussion of . . . [the] ideas and . . . concepts described in subsection (b) of this

section"—that is, the very ideas that the statute makes it unlawful to indoctrinate students in. Ark. Code Ann. 6-16-156(c). If the statute doesn't prohibit discussing even the ideas referenced in its definition of prohibited indoctrination, prohibited indoctrination can't include merely discussing other ideas. And here too, the district court agreed with the State's reading of the statute. In enacting subsection (c), it said, the legislature "took an extra step to make clear that [it was] not trying to reach ordinary teaching." Add. 10; App. 224; R. Doc. 45, at 10. And the legislature didn't just try to make that clear, the district court said; it succeeded. Subsection (c), it wrote, "makes clear that it is the compulsion of a student to accept (and not the mere teaching of) the concepts identified in Section 16(b) that is prohibited." Add. 41; App. 255; R. Doc. 45, at 41.

B.    The district court's contrary reading is unreasonable.

In spite of all this, the district court held on the basis of just four words that it was reasonable to read Section 16 the opposite way when it came to Critical Race Theory. Those words are contained in subsection (d), which "relates to employees, contractors, and guest speakers or lecturers of the [D]epartment" of Education itself, Ark. Code Ann. 6-16-156(d)—not the "public school employee[s]" regulated by other provisions of the statute, *see id.* 6-16-156(b), (e). As to those Department employees, subsection (d) directs the Secretary of Education to "review and enhance the policies that prevent prohibited indoctrination, including

Critical Race Theory." *Id.* 6-16-156(d). Declaring itself obliged to "read[] the statute as a whole" rather than "isolate words out of context," Add. 41; App. 255; R. Doc. 45, at 41, the district court concluded in one sentence that the isolated four words "including Critical Race Theory," though not directed to teachers, "suggest[] that Critical Race Theory is, definitionally, 'prohibited indoctrination,'" Add. 42; App. 256; R. Doc. 45, at 42. That, in turn, meant it was "reasonable" to read Section 16 to prohibit "teaching about Critical Race Theory." *Id.*

Though the district court claimed this "reasonable" reading flowed from the whole text canon, such a reading actually flouts that canon. By reading four words in subsection (d) to imply that merely teaching about Critical Race Theory is prohibited indoctrination, it guts both the statute's actual definition of prohibited indoctrination and its disclaimer of prohibiting discussing ideas like Critical Race Theory.

Yet the district court's reading isn't even a reasonable reading of the four words on which it depends. Subsection (d) directs the Secretary to, within his own department, enhance policies that "prevent prohibited indoctrination, including Critical Race Theory." Ark. Code Ann. 6-16-156(d). Critical Race Theory itself, however, is not something one can literally "prevent"; people can only "prevent" actions, not ideas. *See Prevent*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/prevent ("to stop something from

happening or someone from doing something"). So subsection (d) doesn't imply that "prohibited indoctrination" includes Critical Race Theory itself; it implies that "prohibited indoctrination" includes *doing something* with Critical Race Theory.

There are two possible candidates for what that thing might be: indoctrinating people in Critical Race Theory, or merely teaching about it. The first reading both makes sense of subsection (d) and is consistent with the rest of the statute. If what the Secretary must prevent Department employees from doing with Critical Race Theory is indoctrinating others in it, then it makes perfect sense to direct the Secretary to "prevent prohibited indoctrination, *including* Critical Race Theory."[3] And that reading is consistent with both prohibited indoctrination, which doesn't include ordinary teaching, and with subsection (c), which expressly disclaims prohibiting ordinary teaching, no matter how "offensive" the ideas taught, Ark. Code Ann. 6-16-156(c)(2).

The second reading—that the Secretary must prevent Department employees from *teaching* about Critical Race Theory—is the one the district court deemed reasonable. *See* Add. 42; App. 256; R. Doc. 45, at 42 ("[I]t is plausible to suggest

---

[3] It is also a natural way to use language. For example, a directive to buy any fresh fruit on sale, including any peaches, means one should buy any peaches on sale, not that peaches are somehow always on sale by definition. Or to take a legal example, a statute that applies to any "vendor" of a drug, "including dispensing physicians," "encompass[es] only doctors who would be covered by the word 'vendor,'" rather than defining physicians who do not "act[] as dealers in the sale of drugs" as vendors. *Young v. United States*, 315 U.S. 257, 261 (1942).

[the statute] requires the Secretary to root out *any use* of Critical Race Theory[.]")
(emphasis added).  But that reading makes subsection (d) nonsensical and contradicts the rest of the statute.  It reads "prohibited indoctrination" to "include" teaching that doesn't indoctrinate.  It's contrary to the definition of "prohibited indoctrination," which requires teachers to compel students to adopt, affirm, or profess ideas in order to fall afoul of the prohibition.  It overrides subsection (c)'s disclaimer of prohibiting discussing any idea, even the ones described in subsection (b).  And, were *Pratt* to remain the law, it would create a constitutional question, contrary to Arkansas's canon of constitutional avoidance.  *See Ark. Times*, 37 F.4th at 1393 ("Arkansas's 'first and most important rule of statutory interpretation is that . . . all [ambiguities] are resolved in favor of constitutionality.'") (quoting *Booker v. State*, 984 S.W.2d 16, 21 (Ark. 1998)).  For all these reasons, the district court's reading isn't reasonable, much less likely correct.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order granting a preliminary injunction.

Respectfully submitted,

Tim Griffin
  Arkansas Attorney General

Nicholas J. Bronni
  Arkansas Solicitor General

DYLAN L. JACOBS
  Deputy Solicitor General

ASHER L. STEINBERG
  Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@arkansasag.gov

*Attorneys for Appellees*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 8,952 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/  *Nicholas J. Bronni*
Nicholas J. Bronni

**CERTIFICATE OF SERVICE**

I certify that on July 1, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ *Nicholas J. Bronni*
Nicholas J. Bronni